**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Ch. 11 |
| | ) | |
| Nu Ride Inc., et al.,[1] | ) | |
| | ) | Case No. 23-10831 (MFW) |
| | ) | |
| | ) | (Jointly Administered) |
| Reorganized Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Lordstown Motors Corp. and | ) | |
| Lordstown EV Corporation, | ) | Adv. No. 23-50414(MFW) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Hon Hai Precision Industry | ) | |
| Co., Ltd (a/k/a Hon Hai | ) | |
| Technology Group), | ) | |
| Foxconn EV Technology, Inc., | ) | |
| Foxconn Ventures Pte. Ltd., | ) | |
| Foxconn (Far East) Limited, | ) | |
| and Foxconn EV System LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | Related Docs:  1, 8, 9, 15, |
| | ) | 17, 19, 31, 32, 36, 37, |
| | ) | 51 & 55 |

---

[1]    The reorganized debtors are: Nu Ride Inc. f/k/a Lordstown Motors Corp. ("LMC"); Lordstown EV Corporation ("Lordstown EV"); and Lordstown EV Sales LLC ("Lordstown Sales").

TABLE OF CONTENTS

I.    FACTUAL AND PROCEDURAL BACKGROUND                        1
II.   JURISDICTION                                             6
III.  DISCUSSION                                               8
      A.    Standard of Review                                 8
            1.    Rule 12(b)(6)                                8
            2.    Arbitration                                  11
      B.    Do the Arbitration Clauses Mandate Dismissal?     11
            1.    Continuing Validity of the JVA              13
            2.    Claims not Made Under the CMA or JVA        17
                  a.    Contract Claims under the APA and the
                        Investment Agreement                  18
                  b.    Tort Claims                           19
                  c.    Equitable Subordination Claim         21
            3.    Enforcement of Arbitration on All Parties   24
      C.    Failure to State a Claim?                         30
            1.    Breach of Contract Claims                   30
            2.    Common Law Fraud Claims                     36
                  a.    Duplicative                           36
                  b.    Misrepresentation                     40
                  c.    Scienter                              42
                  d.    Reliance                              45
            3.    Tortious Interference with Contract         49
            4.    Equitable Subordination                     51
                  a.    Proper Standard                       52
                  b.    Egregious Conduct                     53
                        i.    Breach of Contract              53
                        ii.   Fraud                           55
                  c.    Harm                                  56
                  d.    Extent of Subordination               58
IV.   CONCLUSION                                              59

## AMENDED MEMORANDUM OPINION

Before the Court is the Defendants'[2] Motion to Dismiss, or in the alternative, to compel arbitration and stay the Plaintiffs'[3] Complaint which asserts claims related to the parties' prior business dealings.  Because the Court finds that most of the claims are not subject to arbitration and that most of the claims are viable, the Court will grant the Motion in part and deny it in part.

### I.    FACTUAL AND PROCEDURAL BACKGROUND[4]

---

[2]    The Defendants are Hon Hai Precision Industry Co., Ltd (a/k/a Hon Hai Technology Group) ("Hon Hai"), Foxconn (Far East) Limited ("Far East"), Foxconn EV Technology, Inc. ("Foxconn Tech"), Foxconn Ventures Pte. Ltd. ("FVP"), and Foxconn EV System LLC ("Foxconn System").

[3]    The Plaintiffs are LMC and Lordstown EV.

[4]    The Court is not required to state findings of fact or conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.  Instead, the facts recited are those well-pled allegations in the Complaint which must be accepted as true for the purposes of this Motion to Dismiss.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In addition, the Court will take judicial notice of uncontested facts recited in pleadings and orders filed and entered in the main bankruptcy case.  Fed. R. Evid. 210.  See also S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999) ("To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint.").  Cf. In re Aughenbaugh, 125 F.2d 887, 889 (3d Cir. 1942) (holding, as a matter of due process, that the trustee could not rely on pleadings filed in the main bankruptcy case that were not identified and offered into evidence in a contested matter, because the other party had no opportunity to refute them).

On June 27, 2023, LMC and its affiliates (the "Debtors") filed petitions for relief under chapter 11 of the Bankruptcy Code.  On that same day, the Plaintiffs commenced the instant adversary proceeding against the Defendants.  The Debtors sold substantially all of their physical assets during the bankruptcy case,[5] and the Court confirmed the Debtors' plan of reorganization which vested certain of the Debtors' causes of action (including this adversary proceeding) in the Reorganized Debtors.[6]

Prior to the bankruptcy filing, the Debtors had developed and manufactured a line of full-size electric pickup trucks at a plant in Lordstown, Ohio, which the Debtors had purchased from General Motors in 2019.[7]  While the Debtors at one point had been valued at $5.3 billion,[8] the bankruptcy sale of their remaining assets generated only $10 million.[9]

The Plaintiffs blame their misfortunes on the Defendants. The gist of the Plaintiffs' Complaint is that the Defendants

---

[5]    D.I. 586.  References to the docket in the main bankruptcy case are to "D.I. #," while references to the docket in the adversary proceeding are to "Adv. D.I.#."

[6]    D.I. 1069 at p. 10 of 57 (causes of action not released are retained by the post-effective date debtors); D.I. 1069-1 Art. V-J.

[7]    Adv. D.I. 1 at ¶¶ 2, 20.

[8]    Id. at ¶ 2.

[9]    D.I. 586.

induced the Plaintiffs to enter into a series of agreements, promising support through investment and expertise, while harboring the intent to acquire the Plaintiffs' most valuable asset, their manufacturing plant, for themselves without fulfilling those promises.

The dealings between the companies began in September 2021 when the parties entered into an agreement in principle to form a partnership.[10]  The agreement contemplated that the Defendants would (a) buy the Debtors' manufacturing plant, (b) enter into an agreement to manufacture and supply vehicles to the Plaintiffs, and (c) collaborate with the Debtors on the development of future vehicles.[11]  As part of that agreement, a Plant Asset Purchase Agreement ("APA") was executed on November 10, 2021.[12]  The Plaintiffs allege that the price to be paid by the Defendants for the plant was extremely favorable to them because most of the promised benefits for the Plaintiffs would be realized in the contemplated partnership.[13]

The Plaintiffs allege that the Defendants subsequently

---

[10]     Adv. D.I. 1 at ¶ 22.  The Agreement in Principle was executed by Lordstown EV and Foxconn Asset Management LLC.  Id. Ex. A.

[11]     Id. Ex. A.

[12]     Id. at ¶ 29. The APA was executed by Lordstown EV and Foxconn Tech.  Id. Ex. B.  Far East also executed the APA as a guarantor.  Id. at ¶ 28 & Ex. B § 10.18.

[13]     Id. at ¶ 33.

delayed executing a partnership agreement.[14]  On May 11, 2022, only after the Plaintiffs raised their concerns, the Defendants finally executed a Joint Venture Agreement (the "JVA") with the Plaintiffs and closed the sale of the plant under the APA.[15]  On that same day, the parties executed a Contract Manufacturing Agreement (the "CMA") whereby Foxconn System agreed to manufacture the Endurance at the Plant for a fee per vehicle, in accordance with the LMC designs and with components approved by LMC.[16]  The CMA required Foxconn System to use commercially reasonable efforts to negotiate better terms with the Plaintiffs' suppliers and to take advantage of sourcing synergies.[17]

The Plaintiffs allege that the Defendants did not fulfill their obligations under the JVA and obstructed the Plaintiffs' efforts to develop the EV vehicle program contemplated by the parties.[18]  After the Plaintiffs complained about the Defendants' breaches of the JVA, the parties entered into a new agreement to reflect the Defendants' agreement to invest in the EV program

---

[14]    Id.

[15]    Id.  The JVA was executed by Lordstown EV and Foxconn Tech.  Id. Ex. D.

[16]    Id. at ¶ 33, Ex. C at §§ 2(a) & 6.

[17]    Id. at ¶ 33, Ex. C, at § 2(c).  The CMA was executed by Lordstown EV and Foxconn System.

[18]    Id. at ¶¶ 40-42.

(the "Investment Agreement").[19]  Instead of investing in a joint venture, the investment agreement contemplated purchases of LMC stock by FVP.[20]  The initial investment occurred on November 22, 2022.[21]  Additional purchases of stock by FVP were subject to approval by the Committee on Foreign Investment in the United States.[22]  The Plaintiffs allege that the Defendants delayed requesting that approval.[23]  Ultimately, on April 24, 2023, the Defendants did receive approval for the additional investment, but by then the Plaintiffs' stock price had plummeted due to the uncertainty of its business dealings with the Defendants.[24]  The Plaintiffs allege that the Defendants used this as a pretext to attempt to improperly terminate the agreement.[25]

After realizing that the Defendants never intended to fulfill their obligations, the Plaintiffs filed their bankruptcy petitions and the Complaint.[26]

The Complaint contains eleven counts: seven for breach of

---

[19]   Id. at ¶¶ 42-44, Ex. E.

[20]   Id. at ¶ 45, Ex. E, at § 2.01.

[21]   Id. at ¶ 45.

[22]   Id. at ¶ 48, Ex. E, at § 5.02(b).

[23]   Id. at ¶ 50.

[24]   Id. at ¶ 56.

[25]   Id. at ¶ 61.

[26]   D.I. 1; Adv. D.I. 1.

contract, two for fraud, one for tortious interference with contract, and one seeking equitable subordination of the Defendants' claims and equity interests pursuant to section 510(c) of the Bankruptcy Code.

The Defendants' Motion to Dismiss was filed on September 29, 2023.  The Plaintiffs filed their response on November 6, 2023. The Equity Committee intervened on October 12, 2023, and filed a joinder to the Plaintiffs' response on November 6, 2023.  The Defendants filed their Reply on November 30, 2023.  The matter is now ripe for decision.

## II.  <u>JURISDICTION</u>

The Bankruptcy Court has jurisdiction over all "proceedings arising under title 11 or arising in or related to a case under title 11."[27]  The Court finds that the claims in the Plaintiffs' Complaint, while not arising under title 11 or arising in the bankruptcy case, are related to the bankruptcy case because the Debtors' estate consisted of all property of the Debtors as of the petition date, including causes of action that arose pre-petition such as the claims made by the Plaintiffs in the

---

[27]   28 U.S.C. §§ 157(a) & 1334.  <u>See also</u> General Orders, Amended Standing Order of Reference, U.S. Bankruptcy Court for the District of Delaware, Feb. 29, 2012, https://www.deb.uscourts.gov/sites/deb/files/generalorders/Standing_Order20120229_0.pdf.

Complaint.[28]

The Defendants do not consent to the entry of a final order or judgment by the Court if it is determined that the Court cannot enter a final order or judgment consistent with Article III of the United States Constitution.[29]

It is not necessary to decide that issue at this time, however, because the Court does have authority to enter orders on preliminary matters to the extent they do not constitute a final adjudication of a matter over which the Court does not have constitutional authority to enter a final order.[30]  That includes

---

[28]    28 U.S.C. § 541(a)(1).

[29]    See Stern v. Marshall, 564 U.S. 462, 503 (2011) (holding that while bankruptcy court had statutory authority to enter final judgment on core counterclaim, it lacked constitutional authority to do so); Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 683-84 (2015) (holding that the bankruptcy court may enter a final order without offending Article III so long as the parties consent, expressly or impliedly).

[30]    See O'Toole v. McTaggart (In re Trinsum Grp., Inc.), 467 B.R. 734, 738 (Bankr. S.D.N.Y. 2012) (holding that "both before and after Stern v. Marshall, it is clear that the bankruptcy court may handle all pretrial proceedings, including the entry of an interlocutory order dismissing fewer than all of the claims in an adversary complaint.") (citations omitted).  See also Am. Media Inc. v. Anderson Mgmt. Servs. (In re Anderson News, LLC), Civ. No. 15-mc-199-LPS, 2015 WL 4966236, at *1-2 (D. Del. Aug. 19, 2015) (holding that bankruptcy court's authority to enter final orders on non-core claims was not implicated where the court entered an order denying summary judgment because that order was not a final order) (citing Boyd v. King Par, LLC, No. 1:11-CV-1106, 2011 WL 5509873, at *2 (W.D. Mich. Nov. 10, 2011) ("[E]ven if there is uncertainty regarding the bankruptcy court's ability to enter a final judgment . . . that does not deprive the bankruptcy court of the power to entertain all pre-trial

specifically the authority of the Court to determine whether a
matter is core or non-core,[31] whether a matter is governed by an
enforceable arbitration clause,[32] and whether a complaint states
a plausible claim on which relief can be granted.[33]


III. <u>DISCUSSION</u>

The Defendants ask the Court to dismiss (or stay) all of the
claims in the Complaint due to the existence of enforceable
arbitration provisions in the JVA and the CMA.  In the
alternative, the Defendants ask the Court to dismiss all of the
claims for failure to state a claim.

A.   <u>Standard of Review</u>

1.   <u>Rule 12(b)(6)</u>[34]

---

proceedings, including summary judgment motions.")).

[31]   28 U.S.C. § 157(b)(3) ("The bankruptcy judge shall
determine, on the judge's own motion or on timely motion of a
party, whether a proceeding is a core proceeding under this
subsection or is a proceeding that is otherwise related to a case
under title 11.").

[32]   <u>See</u> <u>FBI Wind Down, Inc. v. Heritage Home Grp., LLC (In
re FBI Wind Down, Inc.)</u>, 252 F. Supp. 3d 405, 414-15 (D. Del.
2017), <u>aff'd</u> 741 Fed. Appx. 104 (3d Cir. 2018) (holding that
bankruptcy court properly determined scope of arbitration
agreement and denied motion to compel arbitration).

[33]   <u>See</u> <u>Trinsum Grp.</u>, 467 B.R. at 738 (holding that
bankruptcy court may enter interlocutory order dismissing fewer
than all of the claims in an adversary complaint).

[34]   Fed. R. Civ. P. 12(b)(6).  The applicable Federal Rules
of Civil Procedure are incorporated into the Federal Rules of
Bankruptcy Procedure.  <u>See</u> Fed. R. Bankr. P. 7012.  Therefore,

The Defendants base their Motion to Dismiss on Rule 12(b)(6), which provides for dismissal for "failure to state a claim upon which relief can be granted."[35]  Under Rule 12(b)(6), a complaint "does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[36]

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face."[37]  Two working principles underlie this pleading standard:

> First, the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements. Second, determining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense.[38]

Under this standard, a complaint must nudge claims "across the line from conceivable to plausible."[39]  The court must draw all

---

citations herein are to the Federal Rules of Civil Procedure.

[35]   Fed. R. Civ. P. 12(b)(6).

[36]   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

[37]   Id. at 570.

[38]   Iqbal, 556 U.S. at 663-64 (internal citations omitted).

[39]   Twombly, 550 U.S. at 570.

reasonable inferences in favor of the plaintiff,[40] and the movant "bears the burden to show that the plaintiff's claims are not plausible."[41]

In weighing a motion to dismiss, the Third Circuit instructs courts to follow a three-part analysis. "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"[42] Second, the court must separate the factual and legal elements of the claim, accepting all of the complaint's well-pled facts as true and disregarding any legal conclusions.[43] Third, the court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.[44] After conducting this analysis, the court may conclude that a claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the alleged

---

[40] See, e.g., Alpizar-Fallas v. Favero, 908 F.3d 910, 914 (3d Cir. 2018).

[41] UMB Bank, N.A. v. Sun Cap. Partners V, LP (In re LSC Wind Down, LLC), 610 B.R. 779, 783 (Bankr. D. Del. 2020).

[42] Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 675).

[43] Santiago, 629 F.3d at 130. See also Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

[44] Santiago, 629 F.3d at 130.

misconduct.[45]

### 2.   Arbitration

Instead of dismissing a complaint under Rule 12(b)(6), a court can grant a motion to compel arbitration under the Rule 12(b)(6) standard where "it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause."[46]  "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."[47]

### B.   Do the Arbitration Clauses Mandate Dismissal?

The Defendants argue initially that the Court should compel arbitration of all claims in the Complaint pursuant to mandatory arbitration clauses contained in the JVA[48] and the CMA.[49]  They

---

[45]   Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

[46]   Guidotti v. Legal Helpers Debt Resol., L.L.C., 716 F.3d 764, 776 (3d Cir. 2013) (internal quotations and citation omitted).

[47]   Paragon Litigation Trust v. Noble Corp. (In re Paragon Offshore PLC), 588 B.R. 735, 750 (Bankr. D. Del. 2018) (ellipsis in original).

[48]   The JVA provides in relevant part:

If the parties hereto are unable to reach a resolution pursuant to Section 13.8(c), any disputing party may submit the Dispute for resolution by binding arbitration under the administration of the

-11-

argue that there is a liberal federal policy favoring arbitration
agreements evidenced by the Federal Arbitration Act ("FAA") which
provides that arbitration agreements "shall be valid,
irrevocable, and enforceable."[50]

---

> International Chamber of Commerce ("ICC") in accordance
> with its Rules for Arbitration ("the ICC Rules") in
> effect at the time of the arbitration, subject to such
> modifications set forth in this Agreement.

Adv. D.I. 1 Ex. D, at § 13.8(d) (emphasis added).  The scope of
the matters to be arbitrated under the JVA includes:

> [A]ny and all disputes, controversies or Claims
> (whether sounding in contract, tort, common law,
> statutory law, equity or otherwise), other than a Board
> Deadlock, arising out of or relating to this Agreement,
> including any question regarding its existence or
> scope, the meaning of its provisions, or the proper
> performance of any of its terms by either Member, or
> its breach, termination or invalidity (each such
> dispute, controversy or Claim, a "Dispute").

Id. at § 13.8(a) (emphasis added).

[49]    The CMA provides:

> Arbitration.  Any and all claims, counterclaims,
> demands, cause of action, disputes, controversies, and
> other matters in question arising out of or under this
> Agreement or the alleged breach of any provision hereof
> (all of which are referred to herein as "Disputed
> Claims"), whether such Disputed Claims arise at law or
> in equity, under state or federal law, for damages or
> any other relief, shall be resolved by binding
> arbitration in Cuyahoga County, Ohio, USA, by the
> American Arbitration Association ("AAA/ICDR") in
> accordance with its International Arbitration Rules
> (the "Rules") then in effect.

Adv. D.I. 1 Ex. C, at § 23(b) (emphasis added).

[50]    The FAA provides:

-12-

In the event the Court determines that arbitration is not mandated for all of the claims of the Complaint, the Defendants assert that the Court should stay the non-arbitrable claims pending arbitration of the other claims.[51]

The Plaintiffs argue that neither arbitration nor a stay is mandated in this case for several reasons.

### 1.   Continuing Validity of the JVA

The Plaintiffs contend that the arbitration clause in the JVA is no longer valid at all because that agreement was replaced by the Investment Agreement dated November 7, 2022, which has no arbitration provision.[52]  They rely on the integration clause in the Investment Agreement, which provides:

---

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

9 U.S.C. § 2.  See also Paragon Offshore, 588 B.R. at 747; SFC New Holdings, Inc. v. Earth Grains Co. (In re GWI, Inc.), 269 B.R. 114, 116-17 (Bankr. D. Del. 2001).

[51]    See Appforge, Inc. v. Extended Sys., Inc., No. C.A. 04-704-GMS, 2005 WL 705341, at *10 (D. Del. Mar. 28, 2005).

[52]    Adv. D.I. 1 Ex. E, at § 8.06(b) ("All Actions arising out of or relating to this [Investment] Agreement shall be heard and determined in the Chancery Court of the State of Delaware or . . . any state or federal court within the State of Delaware").

> This [Investment] Agreement, including the Company
> Disclosure Letter, together with the other Transaction
> Documents, constitutes the entire agreement and
> supersedes all other prior agreements and
> understandings, both written and oral, among the
> parties and their Affiliates, or any of them, with
> respect to the subject matter hereof and thereof.[53]

Therefore, the Plaintiffs argue that the method of dispute

resolution in the Investment Agreement controls over the

arbitration clause in the JVA.[54]  The Plaintiffs also rely on

Section 1.1 of the amendment to the JVA (the "JVA Amendment"),

which states that "All obligations of the Members under the [JVA]

shall be terminated, including but not limited to any obligations

to make capital contributions to the Company under Article III,

any restrictions imposed on the Members under Section 1.2 or any

other provision thereof."[55]

Even if the Investment Agreement superseded the investment

obligations of the parties in the JVA, the Defendants argue that

the JVA arbitration provision is still enforceable because the

---

[53]    Id. at § 8.05.

[54]    See Applied Energetics, Inc. v. NewOak Cap. Markets,
LLC, 645 F.3d 522, 525-26 (2d Cir. 2011) (reversing lower court
and finding that subsequent agreement containing terms which
preclude arbitration controlled over prior agreement which
contained arbitration clause).

[55]    The JVA Amendment was attached as Exhibit A to the
Plaintiffs' Response to the Motion to Dismiss but was neither
referenced nor incorporated in the Complaint.  Adv. D.I. 15 Ex.
A.  The Defendants did not object to the Court considering it and
in fact they rely in part on Section 1.2 of the JVA Amendment to
refute the Plaintiffs' arguments.

-14-

JVA contains a provision which explicitly provides that the arbitration provision survives any termination of the JVA.[56]

The Court agrees with the Plaintiffs that the execution of the Investment Agreement superseded the substantive terms of the JVA.  The integration provision of the Investment Agreement states that it is the entire agreement of the parties regarding its subject matter.[57]  The subject matter of both the JVA and the Investment Agreement were the same: the means by which the Defendants would invest funds to promote the development of the Plaintiffs' electric vehicles.  By entering into the Investment Agreement, the Defendants agreed to invest directly in LMC, rather than investing in a joint venture with Lordstown EV.[58]

However, the Court agrees with the Defendants that, notwithstanding the Investment Agreement integration clause, some of the terms of the JVA remain in effect.  If the integration clause of the Investment Agreement eliminated all of the parties' rights and obligations under the JVA, then it would have been unnecessary for the parties to execute the JVA Amendment two

---

[56]    See Adv. D.I. 1 Ex. D, at § 13.14 (providing, inter alia, that the arbitration provisions of § 13.8 "shall survive and continue in full force in accordance with their terms notwithstanding any termination of this Agreement or the termination of the Company.").

[57]    Id. Ex. D, at § 8.05.

[58]    Id. Exs. D & E.

-15-

weeks later.[59]  Furthermore, while Section 1.1 the JVA Amendment
purports to terminate all of the parties' obligations (and
specifically their obligation to make capital contributions under
the JVA), Section 1.2 of the JVA Amendment expressly preserves
all of the other terms of the JVA.[60]

Finally, even if the JVA had been completely terminated by
the execution of the Investment Agreement, the Court concludes
that the arbitration provision of the JVA still survived.  The
parties expressly agreed to the continuing viability of the
arbitration provision in the JVA.[61]  Furthermore, caselaw
supports this conclusion, for obvious reasons.  "To allow a party
to avoid arbitration by simply terminating the contract would
render arbitration clauses illusory and meaningless. . . .  A
party not wishing to arbitrate its alleged breach could simply
terminate that contract and avoid any obligation to arbitrate."[62]

---

[59]    Adv. D.I. 15 Ex. A.

[60]    Id.

[61]    Adv. D.I. 1 Ex. D, at § 13.14.

[62]    See, e.g., Southeastern Pa. Transp. Auth. v. AWS
Remediation, Inc., No. Civ. A. 03-695, 2003 WL 21994811, at *3
(E.D. Pa. Aug. 18, 2003) (holding that arbitration clause
survived debtor's rejection and termination of contract).  See
also Societe Nationale Algerienne Pour La Recherche v. Distrigas
Corp., 80 B.R. 606, 609 (D. Mass. 1987) (holding that arbitration
provision survived debtor's rejection of the underlying
agreement); Madison Foods, Inc. v. Fleming Cos., Inc. (In re
Fleming Cos., Inc.), 325 B.R. 687, 693-94 (Bankr. D. Del. 2005)
(holding "that rejection of a contract, or even breach of it,
will not void an arbitration clause. (In fact, arbitration is

-16-

Therefore, the Court concludes that the arbitration provision of the JVA survived the execution of the Investment Agreement.

The Plaintiffs do not argue that the Investment Agreement superseded the other agreements that the parties executed.[63]  The subject matter of those agreements was different from the subject matter of the Investment Agreement:  the APA dealt with the purchase of the Plant and the CMA dealt with the manufacture of the electric vehicles at the Plant.[64]  Therefore, the Court concludes that the APA and CMA were not superseded by the Investment Agreement.  Consequently, the Court concludes that the arbitration provision of the CMA is also still valid.[65]

  2.    Claims Not Made under the CMA or JVA

---

only sought if there is a breach of the agreement by one of the parties.)  Any different conclusion would allow a party to avoid arbitration at will simply by breaching the contract.").  But see Glazer v. Lehman Bros., 394 F.3d 444, 460 (6th Cir. 2005) (finding that arbitration agreement in prior contract had been superseded and was no longer enforceable because "It is a fundamental precept of contract law that parties may agree to discharge or terminate a contract in favor of creating a second agreement to replace the former, and, when that occurs, the initial agreement is superseded and is no longer enforceable as to any party thereto.").

[63]    See Adv. D.I. 15 at 20.

[64]    Id. Exs. B & C.

[65]    See, e.g., Field Intelligence Inc v. Xylem Dewatering Sols. Inc., 49 F.4th 351 (3d Cir. 2022) (finding that subsequent agreement did not supersede prior one because they each touched on separate subject matters, and, therefore, the arbitration agreement in the prior agreement was enforceable).

The Plaintiffs contend nonetheless that the vast majority of their claims are not covered by the arbitration provisions of the JVA or the CMA.

a.   Contract Claims under the APA and the Investment Agreement

The Plaintiffs argue that the arbitration provisions of the JVA and the CMA are not applicable to the breach of contract claims in Counts Two through Five and Count Seven which are based on the Investment Agreement and APA rather than the JVA or the CMA.  The Plaintiffs note that neither the Investment Agreement nor the APA contain arbitration provisions and instead provide that disputes under those contracts are to be heard in federal or state courts in Delaware.[66]

The Defendants respond that the allegations in the Plaintiffs' Complaint demonstrate that all of the agreements among the parties were inter-related and that, therefore, the

---

[66]   See Adv. D.I. 1 Ex. E, at § 8.06(e) ("All Actions arising out of or relating to [the Investment Agreement] shall be heard and determined in the Chancery Court of the State of Delaware (or, if the Chancery Court of the State of Delaware declines to accept jurisdiction over any Action, any state or federal court within the State of Delaware) and the parties hereto hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action and irrevocably waive the defense of an inconvenient forum or lack of jurisdiction to the maintenance of any such Action."), Ex. B, at § 10.14(a) ("Each Party hereby: (i) agrees that any Proceeding in connection with or relating to [the APA] or any matters contemplated hereby shall be brought exclusively in a court of competent jurisdiction located in the State of Delaware, sitting in Wilmington, Delaware, whether a state or federal court. . . .").

arbitration clauses in the JVA and CMA mandate that all of the Plaintiffs' claims should go to arbitration.[67]

The Court disagrees with the Defendants' conclusion.  The Complaint alleges in Counts Two through Five breaches of specific provisions of the Investment Agreement and in Count Seven breaches of specific provisions of the APA.  Those claims are not "related" to the allegations in Count Six which alleges breaches of specific provisions of the JVA or Count Nine which alleges breaches of specific provisions of the CMA.  Therefore, the Court concludes that the arbitration provisions of the JVA and the CMA are not broad enough to cover the breach of contract claims related to the APA or the Investment Agreement which do not have arbitration provisions.

### b. Tort Claims

The Plaintiffs also argue that the tort claims in Counts One, Eight, and Ten are not covered by the contractual arbitration provisions in the CMA and JVA.

The Defendants assert, however, that the tort claims are covered by the language of the JVA arbitration provision which includes "any and all disputes, controversies or Claims (whether sounding in contract, tort, common law, statutory law, equity or

---

[67]    Detroit Med. Ctr. v. Provider Healthnet Servs., Inc., 269 F. Supp. 2d 487, 493 (D. Del. 2003) (concluding that broad arbitration provision in one agreement applied to claims arising out of another agreement because they were part of the same overall transaction).

otherwise), other than a Board Deadlock, <u>arising out of or relating to this Agreement</u>."[68]  The Defendants argue that the CMA contains similarly broad language, although it does not mention fraud claims specifically.[69]  Therefore, the Defendants argue that the arbitration provisions cover the fraud claims.

The Plaintiffs respond, however, that their fraud claims are not based solely on conduct related to the JVA or CMA, but are based on conduct under all of the contracts and on the entire relationship of the parties before and after executing their agreements.

The Court agrees with the Plaintiffs that their fraud claims relate to all of the Defendants' actions, not just actions related to the CMA or JVA.  In addition, it does not appear that the Plaintiffs' allegations of the alleged tortious actions by the Defendants are premised on any actions related to the CMA. Even if they did relate specifically to the CMA, the Court concludes that the CMA arbitration clause is not applicable to the tort claims because that clause does not expressly include tort claims.

Furthermore, as the Court held above, while the JVA arbitration provisions have survived the execution of the Investment Agreement, the substantive provisions of that

---

[68]    Adv. D.I. 1 Ex. D, at § 13.8(a) (emphasis added).

[69]    <u>Id.</u> Ex. C, at § 23(b).

agreement have not.[70]  Therefore, just as any claim that the
Defendants breached the substantive terms of the JVA has been
superseded by the terms of the Investment Agreement, so too has
any claim that the Defendants committed a fraud "related to" the
substantive terms of the JVA.  Consequently, the Court concludes
that the arbitration provisions of the CMA and JVA do not apply
to the Plaintiffs' tort claims brought in Counts One, Eight, and
Ten.

c.   Equitable Subordination Claim

The Plaintiffs contend that the equitable subordination
claim in Count Eleven is a core claim that arises under the
Bankruptcy Code.  They argue, therefore, that it is not subject
to mandatory arbitration.  The Plaintiffs also argue more
generally that the Court should decline to enforce any valid
arbitration provision in this case because doing so would
jeopardize the objectives of the Bankruptcy Code by resulting in
duplicative litigation in multiple fora.[71]

The Defendants respond that where an otherwise applicable
arbitration clause exists, a bankruptcy court lacks the authority
and discretion to deny its enforcement, even as to core claims,
unless the party opposing arbitration can establish Congressional

---

[70]    See supra text at notes 60-62.

[71]    See Hays & Co. v. Merrill Lynch, Pierce, Fenner &
Smith, Inc., 885 F.2d 1149, 1156-57 (3d Cir. 1989).

intent to exclude the particular claim at issue from the FAA's
pro-arbitration policy.[72]

The Court agrees with the Defendants that the determination
of enforceability of an arbitration provision does not depend on
the nature of the claim and is applicable to core as well as non-
core claims.[73]  The Court further agrees with the Defendants that
the burden of proof is on the Plaintiffs to establish that
Congress intended that a valid arbitration clause should not be
enforced.[74]

> To overcome enforcement of arbitration, a party must
> establish congressional intent to create an exception
> to the FAA's mandate with respect to the party's
> statutory claims.  Congressional intent can be
> discerned in one of three ways: (1) the statute's text,
> (2) the statute's legislative history, or (3) "an
> inherent conflict between arbitration and the statute's
> underlying purposes."[75]

The Plaintiffs assert nonetheless that arbitration of their

---

[72]    See Mintze v. Am. Fin. Servs., Inc. (In re Mintze), 434
F.3d 222, 232-33 (3d Cir. 2006) (holding that the standard for
determining enforcement of arbitration clauses "applies equally
to core and non-core proceedings"); Skernklar v. Heritage Auction
Galleries, Inc. (In re Rarities Grp., Inc.), 434 B.R. 1, 11 (D.
Mass. 2010) (reversing bankruptcy court's order denying
arbitration because arbitration of equitable subordination claim
would not jeopardize the objectives of the Bankruptcy Code and
was mandated).

[73]    Mintze, 434 F.3d at 232-33.

[74]    Shearson/Am. Exp., Inc. v. McMahon, 482 U.S. 220, 227
(1987).

[75]    Mintze, 434 F.3d at 229 (quoting McMahon, 482 U.S. at
227).

claims would conflict with Congressional intent.  They rely principally on the APF decision which involved claims for breach of various contracts, only some of which had arbitration clauses.[76]  The APF Court declined to enforce any of the arbitration clauses because it would force the debtors to litigate in several diverse fora, which "inherently conflict[s] with the fundamental tenet of centralized resolution of purely bankruptcy issues."[77]

The Court does not find the same problem exists in this case to the extent that it did in APF.  In APF there were many contracts and numerous claims at issue, each of which were dependent on a different contract.[78]  Further, it was not altogether clear whether all of the contracts at issue had arbitration clauses,[79] causing the Court to conclude that enforcement of the arbitration clause for some of the contracts "will result in piecemeal litigation and unnecessary expense for both parties."[80]

In this case, as the Court has concluded, no valid

---

[76]    Pardo v. Pacificare of Texas, Inc. (In re APF Co.), 264 B.R. 344, 363-64 (Bankr. D. Del. 2001).

[77]    Id. (citing Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149, 1156-57 (3d Cir. 1989)).

[78]    APF, 264 B.R. at 363.

[79]    Id. at 364.

[80]    Id.

substantive claims remain to be arbitrated under the JVA and the CMA arbitration provision is limited to the claims arising under that contract (but not to any of the fraud claims).  Therefore, there is only a limited claim that is subject to arbitration, which the Court does not believe will impede or interfere with the prosecution of the Plaintiffs' other claims in this Court. The Court finds that there is not any inherent policy conflict between having the CMA breach of contract claim decided by arbitration and the Bankruptcy Code's underlying policies.[81]

The Court does, however, note that the equitable subordination claim brought in Count Eleven is based, at least in part, on allegations of inequitable conduct arising under the CMA.  Therefore, to the extent that the Plaintiffs wish to proceed in this Court with prosecution of their equitable subordination claim, they must do so without relying on inequitable conduct relating to the CMA.

3.  Enforcement of Arbitration on All Parties

The Defendants argue that even though not all of the parties' agreements have arbitration clauses, the Court should order that all of the Plaintiffs' claims be sent to arbitration.

---

[81]  See SFC New Holdings, Inc. v. The Earthgrains Co. (In re GWI, Inc.), 269 B.R. 114, 119 (Bankr. D. Del. 2001) (finding "no evidence" that "permitting arbitration of claims is a threat to the bankruptcy process. Instead, it often results in a quicker and more economic resolution of claims.  We find no reason to conclude that this case will be any different from the myriad other cases which are regularly decided in arbitration.").

They contend that courts have compelled arbitration on non-signatories in several circumstances, including (i) when there is a "close relationship between the entities involved,"[82] (ii) when a non-signatory to a contract containing an arbitration clause "embrace[s]" that contract,[83] (iii) when a signatory to an arbitration clause raises allegations of "substantially interdependent and concerted misconduct" by both a signatory and a non-signatory to the clause,[84] and (iv) when a signatory to a written agreement containing an arbitration clause relies on the terms of the written agreement in asserting its claims against the non-signatory.[85]  The Defendants contend that all those circumstances exist here: the Plaintiffs themselves have alleged that all of the Defendants are closely related, that they acted in concert to commit a fraud on the Plaintiffs, and that the Plaintiffs are relying on the various terms of the contracts to support their claims.[86]  In addition, all of the Defendants have

---

[82]   *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 199, 201 (3d Cir. 2001).

[83]   *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220-21 (3d Cir. 2014).

[84]   *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1153 (Del. Ch. 2006).

[85]   *Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*, No. CIV.A. 2037-N, 2006 WL 2473665, at *5 (Del. Ch. Aug. 22, 2006).

[86]   Adv. D.I. 1 at ¶¶ 29-30, 32-34, 43-44, 47.

"embraced" the contracts to the extent they all seek to enforce the arbitration clauses.

The Plaintiffs respond that "[o]nly parties that have entered into a valid agreement can be forced to arbitrate.  As such, 'before compelling arbitration pursuant to the [FAA] . . . a court must determine that (1) an enforceable agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement.'"[87]  In this case, the Plaintiffs assert that the parties to the APA and the Investment Agreement have not agreed to arbitrate their disputes[88] and are not all parties to the JVA and CMA.[89]  The Plaintiffs note that both the CMA and the JVA state that there are no intended beneficiaries of them, thereby negating any suggestion that any non-signatories could seek to enforce any of their provisions, including the arbitration provisions.[90]  Therefore, the Plaintiffs contend that to the extent they assert claims on behalf of or against parties who are not signatories to either the JVA or the CMA, those

---

[87]    Paragon Offshore, 588 B.R. at 748.  See also Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009); 31 Moore's Federal Practice § 906.02[4][a] (2018).

[88]    Adv. D.I. 1 Ex. D, at § 8.05, Ex. B, at § 10.14(a).

[89]    The JVA was between Lordstown EV and Foxconn Tech, the CMA was between Lordstown EV and Foxconn System, while the APA was between Lordstown EV and Foxconn Tech and the Investment Agreement was between LMC and FVP. Id. Exs. B, C, D & E.

[90]    Adv. D.I. 1 Ex. C, at § 24(m), Ex. D, at § 13.6.

claims are not subject to arbitration.[91]

The Court agrees with the Plaintiffs.  The Plaintiffs did not agree to arbitrate any claims against the Defendants except those extant under the CMA and JVA.  The cases cited by the Defendants do not convince the Court to extend the limited arbitration clauses of those agreements to cover all of the Plaintiffs' claims in the Complaint.  Several of the cases cited by the Defendants actually denied enforcement of an arbitration provision against a non-signatory.[92]  The cases that did enforce an arbitration provision against a non-signatory were premised on equitable considerations that the Court does not find present here.[93]  In fact, there are substantial equitable reasons not to

---

[91]   Kuroda v. SPJS Holdings, L.L.C., Civil Action No. 4030-CC., 2010 WL 4880659, at *4 (Del. Ch. Nov. 30, 2010) ("As a nonparty to the Consulting Agreement, plaintiff cannot invoke its arbitration clause."); Fives Bronx Inc. v. Kraft Werks Eng'g, LLC, Case No. 1:22-cv-00551, 2023 WL 2599627, at *8 (N.D. Ohio Mar. 21, 2023) (holding that Ohio law "generally prevents nonparties from enforcing arbitration clauses unless they are intended third-party beneficiaries") (internal quotation marks omitted).

[92]   Flintkote Co., 769 F.3d at 220-21 (reversing district court's order compelling arbitration against a non-signatory because the evidence did not support a finding that the non-signatory had embraced the agreement by seeking to assert significant affirmative rights under it and because it received no benefits from the agreement); DuPont, 269 F.3d at 199-200 (affirming district court's order denying motion to compel arbitration against a non-signatory which was not an intended beneficiary of the contract, the signatory to the contract was not its agent, and there were no equitable reasons to do so).

[93]   Douzinas, 888 A.2d at 1153 (concluding that non-signatories to LLC agreement could enforce arbitration clause of

-27-

do so in this case.

First, the CMA and JVA require arbitration in two different fora.[94]  As a result, it is unclear which arbitral forum should hear which claims (other than direct claims under the specific agreement which has an arbitration clause).

Second, with respect to the Complaint's contract claims, the Plaintiffs assert breaches of specific contractual provisions separately against only the parties to those contracts most of which do not have arbitration provisions.  Therefore, there are no equitable reasons why they should be heard in an arbitration involving distinct claims against other parties under other contracts.

With respect to the fraud claims, the arbitration provisions of the CMA and JVA are not so broad as to cover the claims of fraud by the Defendants which are premised on all of the actions of the Defendants, not simply actions related to the CMA and JVA.  Therefore, there is no equitable reason to compel arbitration of

---

that agreement under equitable estoppel because claims against non-signatories were based on breach of that agreement and implicated defenses extant under the agreement); Wilcox & Fetzer, 2006 WL 2473665, at *5 (allowing non-signatory to compel arbitration against signatory because signatory's common law trade name claim against non-signatory was directly related to the contract).

[94]   Adv. D.I. 1 Ex. D, at § 13.8(d) (the International Chamber of Commerce ("ICC") in accordance with its Rules for Arbitration), Ex. C, at § 23(b)(AAA/ICDR in Cuyahoga County, Ohio), in accordance with its International Arbitration Rules).

all those claims.  Nor is there any equitable reason to compel
arbitration of the equitable subordination claim, which is
relevant specifically to the rights of the parties in this
bankruptcy case to a distribution under the confirmed plan.

As a result, the Court will deny the Motion to compel
arbitration with respect to all claims except those in Count Nine
relating to breach of the CMA.

However, the Court does not find it appropriate to stay
prosecution of all of the other claims in the Complaint while the
parties arbitrate the CMA claims.[95]  As is evident from the above
discussion, the Court does not find the claims so inter-related
as to necessitate resolution in one forum.  While inconvenient,
the Court also does not find that the concurrent prosecution of

---

[95]   The decision to stay or not stay litigation pending
arbitration is within the Court's discretion.  See, e.g., Paragon
Offshore, 588 B.R. at 762 (denying both parties' motions for stay
and allowing both arbitration and litigation to run concurrently
because "[u]ltimately, the Court sees the [sic] no reason to
delay litigation of the majority of the claims pending the
resolution of one associated claim, particularly given the more
limited collateral estoppel problems established by the results
of arbitration."); Shubert v. Wellspring Media, Inc. (In re
Winstar Commc'ns, Inc.), 335 B.R. 556, 565 (Bankr. D. Del. 2005)
(compelling arbitration and staying adversary proceeding but
stating that "a bankruptcy court retains significant discretion
to assess whether arbitration would be consistent with the
purpose of the Code, including the goal of centralized resolution
of purely bankruptcy issues, the need to protect creditors and
reorganizing debtor from piecemeal litigation. . . .").  See also
Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221-22 (1985)
(reversing denial of motion to compel arbitration and observing
that the FAA requires the result of "piecemeal" litigation in
multiple forums "absent a countervailing policy manifested in
another federal statute").

the adversary proceeding and the CMA claims will pose an insurmountable burden on the estate.  Therefore, the Court will not stay this proceeding but will simply grant the motion to dismiss the CMA claim to allow it to proceed to arbitration.

C.   Failure to State a Claim?

The Defendants also seek dismissal of the Complaint for failure to state a claim.  The Defendants argue that (1) the Plaintiffs fail to plead damages sufficiently for the breach of contract claims; (2) the common law tort claims are duplicative of the claims for breach of contract; (3) the Plaintiffs fail to plead the necessary elements of misrepresentation, scienter, and reliance for the fraud claims; (4) the Complaint fails to state a cause of action for tortious interference with contract; and (5) the Complaint fails to state a claim for equitable subordination.

1.   Breach of Contract Claims

In Counts Two through Seven, the Plaintiffs bring claims for alleged breaches of the Investment Agreement, the JVA, and the APA.[96]  Under Delaware law, the elements of breach of contract are: "1) a contract existed between the parties; (2) the defendant breached an obligation imposed by the contract; and (3)

---

[96]   The Court has already determined that the claim for breach of contract relating to the CMA must be arbitrated. Therefore, the Court will not address whether the Plaintiffs state a claim with respect to Count Nine.

the plaintiff suffered damages as a result of the breach."[97]

The Defendants do not dispute that the Plaintiffs have pled the existence of a contract and a breach.

As noted above, the Court has concluded that the arbitration provisions of the JVA mandate that any dispute regarding its breach must be arbitrated.  The Court will, therefore, dismiss Count Six of the Complaint.

With respect to the other breach of contract claims, the Defendants contend that the Complaint fails to satisfy the third element of a breach of contract claim.  They characterize the Plaintiffs' allegations that they suffered "billions of dollars"[98] in contract damages as purely speculative based on some future value of the company had it succeeded for decades. They argue that the alleged damages are <u>unforeseeable</u> consequential damages which are not recoverable under Delaware law.[99]  The Defendants further assert that those allegations are

---

[97]    <u>Banner v. Morsi Auto. Corp.</u>, CPU4-16-000333, 2017 WL 439335, at *4 (Del. Com. Pl. Feb. 1, 2017).

[98]    Adv. D.I. 1 at ¶¶ 94, 102, 114, 122.

[99]    <u>Pharma. Prod. Dev., Inc. v. TVM Life Sci. Ventures VI, L.P.</u>, No. 5688-VCS, 2011 WL 549163, at *6 n.43 (Del. Ch. Feb. 16, 2011) (noting that consequential damages are recoverable from a breaching party only if that party knew that "particular, though unusual, damages will follow or may follow the [breaching party's] failure to perform its agreement") (citing Williston on Contracts § 64:12 (4th ed. 2010)).  <u>See also</u> <u>Hajoca Corp. v. Sec. Tr. Co.</u>, 25 A.2d 378, 381 (Del. Super. Ct. 1942) (holding that a party can recover indirect damages resulting from a breach of contract only if "the plaintiff is able to allege and prove that

-31-

conclusory, without any supporting facts to establish that they resulted from any breach of the contract or were foreseeable.[100] Consequently, the Defendants ask that the Court dismiss the contract claims for failure to allege damages or, in the alternative, that it limit the Plaintiffs' recovery to direct damages.

The Plaintiffs respond that the foreseeability of damages is a factual issue that should not be decided on a motion to dismiss.[101] The Plaintiffs assert that many of the cases cited by

---

the particular condition which made the damage a possible and likely consequence of the breach was known to the defendant at the time the contract was made"); RTN Invs., LLC v. RETN, LLC, No. 08C-04-007JRJ, 2011 WL 862268, at *18 (Del. Super. Ct. Feb. 10, 2011) (dismissing defendants' counterclaim for fees and expenses incurred because they were not reasonably foreseeable consequential damages).

[100]    See Scheuer v. U.S. Liab. Ins. Co., 7:22-CV-09474 (NSR), 2023 WL 4275114, at *3-4 (S.D.N.Y. June 27, 2023) (dismissing claim where plaintiffs merely asserted they had "suffered additional consequential damages in an amount to be determined at the time of trial" without alleging facts sufficient to establish that the damages were a natural and probable consequence of the breach of contract, were or should have been foreseeable, and were reasonably contemplated by the contracting parties at the time of the contract); Zayo Group, LLC v. Latisys Holdings, LLC, No. 12874-VCS, 2018 WL 6177174, at *15 (Del. Ch. Nov. 26, 2018) (finding that plaintiff had failed to prove damages and stating that "[c]ontract damages are not like some works of abstract art; the plaintiff cannot simply throw its proof against the canvas and hope that something recognizable as damages emerges").

[101]    See Catena v. NVR, Inc., 2:20-CV-00160-MJH, 2020 WL 3412348, at *9 (W.D. Pa. June 22, 2020) (denying motion to dismiss claims for consequential damages based on argument that it was unconscionable because that was a fact-based inquiry, "not well-suited for the Motion to Dismiss stage").  See also Roman

the Defendants themselves support this position because the
rulings were not made on a motion to dismiss but only after
consideration of the merits.[102]  The Plaintiffs also contend that
the Complaint does contain allegations of direct damages, not
simply consequential damages.[103]  They assert that their
allegations of damages are not conclusory or unforeseeable but
are evidenced, in part, by statements made by the Defendants
themselves of the projected value of the parties' contractual

---

Catholic Diocese of Rockville Ctr. v. Gen. Reinsurance Corp., 16
CIV 02063 (CM), 2016 WL 5793996, at *5 (S.D.N.Y. Sept. 23, 2016)
(denying motion to dismiss because the issue of "[w]hether the
injuries that gave rise to Plaintiff's claims for consequential
damages were 'reasonably foreseeable and contemplated by the
parties,' is a factual issue") (internal citation omitted);
Pharma. Prod. Dev., 2011 WL 549163, at *6 (denying motion to
dismiss because it was premature at the pleading stage to
determine which damages may have been foreseeable); Cummings v.
Allstate Ins. Co., Civ.A. 11-02691, 2011 WL 4528366, at *9 (E.D.
Pa. Sept. 30, 2011) (finding it premature to determine the extent
of damages before a breach of contract had even been found).

[102]   See, e.g., Paul v. Deloitte & Touche, LLP, 974 A.2d
140, 146 (Del. 2009) (ruling on appeal from summary judgment);
Zayo Grp., 2018 WL 6177174, at *2 (judgment following trial).

[103]   Adv. D.I. 1 at ¶ 39 (alleging that "Defendants' actions
deprived the Company of the enormous cost savings and time
advantages of working with an existing vehicle design."), ¶¶ 73-
78 (detailing consequences of breaches of contract), ¶ 102
(alleging that "[a]s a direct and proximate cause of FVP's
breaches of its contractual obligations, the Company's ability to
continue operations is in jeopardy, and it suffered, and will
continue to suffer, billions of dollars in damages."). See also
id. at ¶¶ 114, 122, 129, 136, 151 (using similar language in the
other breach of contract counts).

relationship.[104]

The Court finds that the Plaintiffs have adequately alleged that they suffered damages as a direct result of the Defendants' breach of their various contracts.  Although the "billions of dollars" in damages alleged might be conclusory standing in isolation, it can be reasonably inferred from the other allegations of the Complaint that a breach of the Investment Agreement, which contemplated an infusion of $170 million into the business,[105] would foreseeably result in significant damages.

Furthermore, the Court concludes that it is premature at the pleading stage to decide factual issues (such as whether and to what extent the alleged damages are direct or consequential).  "At this juncture, it is sufficient that Plaintiffs have alleged direct damages.  The degree to which the claimed damages were foreseeable and their probability as a consequence of the breach [of contract] are questions that require further factual development before answering."[106]  The cases cited by the

---

[104]   Id. at ¶¶ 24, 78 (quoting Foxconn characterizing the companies' partnership as "a trillion-dollar business opportunity for electric vehicles").

[105]   Adv. D.I. 1 at ¶¶ 44-46.

[106]   Indep. Realty Tr., Inc. v. USA Carrington Park 20, LLC, CV N20C-07-316 FWW, 2022 WL 625293, at *5 (Del. Super. Ct. Mar. 1, 2022) (denying motion to dismiss).  Accord Pharma. Prod. Dev., 2011 WL 549163, at *6.  See also Roman Catholic Diocese, 2016 WL 5793996, at *5 (denying motion to dismiss consequential damages claim); Cummings, 2011 WL 4528366, at *9 (denying motion to dismiss).

Defendants in support of their motion actually support this conclusion as they either denied a motion to dismiss or were decided only after considering a full evidentiary record.[107]

Consequently, the Court will grant the Motion to Dismiss the breach of contract claims in Count Six but will deny it with respect to the breach of contract claims in Counts Two through Five and Count Seven.

### 2. Common Law Fraud Claims

In Count One the Plaintiffs bring a claim for common law fraud against Hon Hai, while in Count Eight they bring a claim for common law fraud against Far East.  The elements of a fraud claim under Delaware law are:

> (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[108]

---

[107] See, e.g., Paul, 974 A.2d at 146 (ruling on appeal from summary judgment); Indep. Realty Tr., 2022 WL 625293, at *5 (denying motion to dismiss); Zayo Grp., 2018 WL 6177174, *2 (rendering decision following trial); Roman Catholic Diocese, 2016 WL 5793996, at *5 (denying motion to dismiss consequential damages claim); Pharma. Prod. Dev., 2011 WL 549163, at *6 (denying motion to dismiss); Cummings, 2011 WL 4528366, at *9 (denying motion to dismiss).

[108] Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P., 176 F. Supp. 3d 387, 400 (D. Del. 2016).

-35-

Claims sounding in fraud must be stated with particularity.[109]

The Defendants raise several arguments in support of their motion to dismiss the fraud claims.

### a. Duplicative

The Defendants contend that the Plaintiffs' fraud claims are improperly duplicative of each other and of their breach of contract claims.  The Defendants argue that in order to state both a fraud claim and a breach of contract claim the Plaintiffs must allege wrongful conduct beyond the breach of contract itself, as well as damages resulting from the fraud which are separate from the breach of contract damages.[110]  They assert that the Plaintiffs cannot convert their breach of contract claim into a fraud claim simply by alleging that the Defendants never intended to perform the contract.[111]

---

[109]    Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009(b).

[110]    Norman v. Elkin, 860 F.3d 111, 131 (3d Cir. 2017) (affirming lower court's decision to vacate jury's judgment on the fraud count because plaintiff did not prove damages resulting from the fraud that were different from the breach of contract damages).

[111]    See Universal Am. Corp., 176 F. Supp. 3d at 403 (stating that a plaintiff cannot bootstrap "a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations"). See also Lion 2004 Receivables Tr. v. Long Term Preferred Care, Inc., No. 16-723-RGA-MPT, 2017 WL 1053100, at *7 (D. Del. Mar. 20, 2017) (stating that "As a general rule, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort."); MicroStrategy Inc. v. Acacia Rsch. Corp., No. 10-5735, 2010 WL

The Plaintiffs argue that their fraud claims are not based on the breaches of their contracts but instead are based on the Defendants' improper conduct beyond breach of the contracts alone.  For example, the Complaint alleges Foxconn induced the Plaintiffs to enter into the contracts with knowledge that it never intended to fulfill its promises and that the Plaintiffs were damaged as a result.[112]  The Plaintiffs contend that despite the broad quotes from the authority the Defendants cite, the holdings of the cases they cite actually support the Plaintiffs' position.[113]

5550455, at *17 (Del. Ch. Dec. 30, 2010) (stating that "couching an alleged failure to comply with the contract at issue as a failure to disclose an intention to take certain actions arguably inconsistent with that contract is exactly the type of bootstrapping this Court will not entertain"); Pinkert v. John J. Olivieri, P.A., CIV. A. 99-380-SLR, 2001 WL 641737, at *5 (D. Del. May 24, 2001) )(granting summary judgment and dismissing fraud claims because "[a]s a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort").

[112]   Adv. D.I. 1 at ¶¶ 81, 82, 85.

[113]   Universal Am. Corp., 176 F. Supp. 3d at 403 (denying motion to dismiss common law fraud claims because plaintiff did not merely allege that the Defendants failed to comply with their obligations under the agreement, it alleged that certain representations in the agreement were false); Lion 2004, 2017 WL 1053100, at *7 (denying motion to dismiss because plaintiff alleged defendant induced it to enter into contract by false representations and alleged that it suffered damages as a result of reliance on those false representations in addition to the damages suffered as a result of a breach of that contract); MicroStrategy Inc., 2010 WL 5550455, at *17 (denying motion to dismiss fraud claim only to extent it was premised on fraudulent

-37-

The Court agrees with the Plaintiffs.  While the general rule in Delaware is that a plaintiff cannot state a claim for both a breach of contract and a claim for fraud premised on the same actions and damages, the law does allow a plaintiff to state claims for breach of contract and for fraud based on allegations of different actions and damages.[114]

Furthermore, this case is at the pleading stage only, and the Plaintiff has sufficiently alleged damages and improper conduct of the Defendants independent of its allegations that they breached their contracts.[115]  The instant case is readily

_____

inducement).

[114]    <u>Id.</u>

[115]    Adv. D.I. 1 at ¶¶ 81-82 ("Foxconn has induced Plaintiffs to enter into a series of agreements, including the AIP, the Plant APA, the CMA, the JV Agreement, and the Investment Agreement, based on the false representation that it sought a partnership with Plaintiffs to jointly develop the next generation of electric vehicles.  Foxconn knew that it never intended to have a partnership and its statements regarding its interest in a partnership with Plaintiffs were false. Rather than seeking to develop a partnership with Plaintiffs, Foxconn intended to deprive the Company of necessary capital and sabotage its business in an effort to strip Plaintiffs' assets and poach its talent at little cost."), ¶ 85 ("As a direct and proximate cause of Foxconn's fraudulent conduct, the Company sold its most valuable asset and refrained from pursuing opportunities with other strategic partners. Deprived of necessary funding and cooperation to develop a scalable vehicle development platform, Plaintiffs' ability to continue operations is in jeopardy, and they have suffered, and will continue to suffer, billions of dollars in damages.").  <u>See</u> <u>Lion 2004</u>, 2017 WL 1053100, at *7 (holding that allegation that plaintiff had suffered damages as a result of its reliance on false representations was sufficient to satisfy the pleading standard for fraud under Delaware law).

distinguishable from cases where a fraud claim was dismissed as duplicative of a contract claim after a full evidentiary record revealed that the evidence in support of each was identical.[116]

In addition, the Court notes that, pursuant to Rule 8, the Plaintiffs may plead claims in the alternative.[117]

Accordingly, the Court concludes that the Motion to dismiss the fraud claims as duplicative of the contract claims is not well-founded.

      b.   Misrepresentation

The Defendants contend that the Plaintiffs fail to plead that they made any material misrepresentations.  The Defendants say that one of the only examples of misrepresentations allegedly

---

[116]   See, e.g., Norman, 860 F.3d at 131 (vacating verdict where plaintiff had failed to prove any damages for fraud apart from the damages for breach of contract).

[117]   Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").  See, e.g., Tatel v. Mt. Lebanon Sch. Dist., 675 F. Supp. 3d 551, 570, n.17 (W.D. Pa. 2023) (noting that, pursuant to Rule 8(d), a party may plead duplicative claims in the alternative); IS BBFP LLC v. Ctr. City Healthcare, LLC (In re Ctr. City Healthcare, LLC), Nos. 19-11466 (MFW), 23-50337(MFW), 2024 WL 124245, at *15 (Bankr. D. Del. Jan. 10, 2024) (holding that Rule 8 allows pleading of breach of contract and tort claims even if Pennsylvania's gist of the action doctrine would preclude a double recovery under contract and tort theories); Earth Pipeline Servs., Inc. v. Columbia Gas Transmission, Inc. (In re Welded Constr., L.P.), Case No. 18-12378 (CSS) Adv. Pro. No. 19-50274, 2021 WL 3674072, at *6 (Bankr. D. Del. Aug. 19, 2021) ("Inconsistent, hypothetical, and alternative claims are allowed under both the Federal Rules of Civil Procedure and West Virginia procedural laws.").

made by the Defendants is Foxconn's statement that it had "high expectations" that the joint venture would be successful.[118]   The Defendants argue that that statement is not evidence of fraud because an expectation is not a misrepresentation of fact.[119]

The Plaintiffs argue that the Defendants are ignoring the central misrepresentation alleged in the complaint: that the Plaintiffs were misled by the Defendants to enter into a series of agreements by the false representation that the Defendants sought a long-term partnership with the Plaintiffs when their goal was instead to sabotage the Plaintiffs' business and strip the Plaintiffs of their assets.[120]   The Plaintiffs argue that the Defendants' own authority demonstrates that these allegations are sufficient.[121]

---

[118]   Adv. D.I. 1 at ¶ 24 ("Foxconn touted the benefits of this deal to the Company and to the public.   On September 30, 2021, Foxconn Chairman Young Liu said he had 'high expectations through this partnership that we will be able to successfully integrate our resources with Lordstown Motors.   In addition to achieving the goal of moving ahead our timeline to establish electric vehicle production capacity in North America, it also reflects Foxconn's flexibility in providing design and production services for different EV customers.'").

[119]   See In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 279 (3d Cir. 2004) (holding, in the context of securities fraud claim, that "vague expressions of hope" do not constitute misrepresentations).

[120]   Adv. D.I. 1 at ¶¶ 81-82.

[121]   See, e.g., Universal Am. Corp., 176 F. Supp. 3d at 403 (denying motion to dismiss fraud claims based on false representations made in the contract).

In reply, the Defendants argue that there was no misrepresentation of an intent to enter into a partnership with the Plaintiffs as evidenced by the fact that the Defendants did enter into a joint venture with the Plaintiffs by executing the various agreements with the Plaintiffs.

The Court concludes that the Plaintiffs have sufficiently pled misrepresentation as a basis for their fraud claims.  The Defendants focus on one allegation in the Complaint,[122] without acknowledging the totality of the Plaintiffs' allegations. Although the Defendants did enter into the JVA and other contracts with the Plaintiffs, the allegations are that the Defendants almost immediately reneged on their obligations rather than perform them in good faith.[123]

These allegations create a plausible inference that the Defendants' representations that they intended to perform under the agreements with the Plaintiffs (rather than just execute them

---

[122]    Adv. D.I. 1 at ¶ 81 ("Foxconn has induced Plaintiffs to enter into a series of agreements, including the AIP, the Plant APA, the CMA, the JV Agreement, and the Investment Agreement, based on the false representation that it sought a partnership with Plaintiffs to jointly develop the next generation of electric vehicles.").

[123]    For example, the Plaintiffs allege that although Foxconn had committed to advance $100 million for the joint venture, it never approved the budget on which the advance was conditioned.  Id. at ¶ 40.  Similarly, the Plaintiffs allege that the Defendants failed to assist the Plaintiffs in reducing their costs by obtaining more favorable terms with suppliers.  Id. at ¶¶ 37, 39.

in an effort to acquire the Lordstown Plant) were materially
false representations.

c.   Scienter

The Defendants also contend that the Plaintiffs have failed
to plead scienter as required to state a fraud claim.

"Under Delaware law, scienter can be proven by establishing
that the defendant acted with knowledge of the falsity of a
statement or with reckless indifference to its truth."[124]
"Although scienter may be averred generally, when a plaintiff
pleads a claim of fraud that charges that the defendants knew
something, it must allege sufficient facts from which it can
reasonably be inferred that this 'something' was knowable and
that the defendants were in a position to know it."[125]   Rule 9(b)
requires that to allege fraud "a party must state with
particularity the circumstances constituting fraud or mistake.
Malice, intent, knowledge, and other conditions of a person's
mind may be alleged generally."[126]

The Defendants argue that the Plaintiffs' losses were due to
their own business mistakes and cannot be used to infer scienter

---

[124]   In re Wayport, Inc. Litig., 76 A.3d 296, 326 (Del. Ch.
2013).

[125]   Van Roy v. Sakhr Software Co., 1:11-CV-00863-LPS, 2014
WL 3367275, at *5 (D. Del. July 8, 2014) (internal quotation and
citation omitted) (dismissing fraud claim for failure to plead
scienter).

[126]   Fed. R. Civ. P. 9(b).

-42-

on the part of the Defendants.  The Defendants also contend that the Plaintiffs improperly impute "Foxconn's" alleged actions to Far East, with no allegation to connect them beyond their corporate affiliation.[127]

The Plaintiffs respond that they have adequately pled scienter. They reference their express allegation that the Defendants never intended to partner with the Plaintiffs.[128]  The Plaintiffs note that under the Defendants' own authority, a party's pattern of behavior may also be sufficient to support an inference of scienter.[129]  Here, they contend that their allegations of the Defendants' numerous misrepresentations and subsequent behavior of intentionally dragging their feet to avoid performing their agreements with the Plaintiffs support the

---

[127]   SLF Holdings, LLC v. Uniti Fiber Holdings, Inc., 499 F. Supp. 3d 49, 68 (D. Del. 2020), aff'd, No. 20-3427, 2022 WL 3442353 (3d Cir. Aug. 17, 2022) (holding that for the scienter of a subsidiary to be imputed to its parent, a plaintiff must show that the "parent . . . possessed some degree of control over, or awareness about, the fraud").

[128]   Adv. D.I. 1 at ¶ 82 ("Foxconn knew that it never intended to have a partnership and its statements regarding its interest in a partnership with Plaintiffs were false.  Rather than seeking to develop a partnership with Plaintiffs, Foxconn intended to deprive the [Plaintiffs] of necessary capital and sabotage its business in an effort to strip Plaintiffs' assets and poach its talent at little cost.").

[129]   See Deloitte LLP v. Flanagan, No. 4125-VCN, 2009 WL 5200657, at *8 (Del. Ch. Dec. 29, 2009) (holding that circumstantial evidence may be used to prove scienter and concluding that the magnitude of unauthorized trades and obvious use of nonpublic information in making those trades led to a clear inference of scienter in insider-trading case).

-43-

inference that the Defendants had the requisite scienter to defraud them.

The Plaintiffs further argue that they are not relying on allegations against one Defendant to establish fraud by another. Instead, they contend that the Complaint contains allegations that each Defendant took specific fraudulent actions to further the Defendants' fraudulent scheme.  For example, the Plaintiffs note that the Complaint alleges that Far East induced the Plaintiffs to sell the Plant to it, as part of the fraudulent scheme.[130]

The Court agrees with the Plaintiffs that their allegations are sufficient to create an inference of scienter on the part of the Defendants.  The Defendants' pattern of behavior supports an inference that they intentionally and knowingly induced the Plaintiffs to execute the various agreements in order to "deprive the company of necessary capital and sabotage its business in an effort to strip the Plaintiff's' assets and poach its talent."[131]

> d.  <u>Reliance</u>

The Defendants also argue that the element of reliance is

---

[130]    Adv. D.I. 1 at ¶ 143 ("Foxconn (Far East) Limited made its statements regarding Foxconn's interest in a partnership with Plaintiffs with the intent to induce Plaintiffs to enter into the Plant APA and deprive Plaintiffs of their most valuable asset. The Plant APA was an instrument by which Foxconn and Foxconn (Far East) Limited perpetrated a broader scheme to loot Plaintiffs of their most valuable assets.").

[131]    <u>Id.</u> at ¶ 82.

not pled by the Plaintiffs sufficiently to support their fraud

claims.  Under Delaware law the Plaintiffs must allege that they

justifiably relied on the alleged misrepresentations.[132]

The Defendants argue that the "anti-reliance" provisions of

the agreements[133] bar any reliance by the Plaintiffs on any other,

oral statements made by the Defendants.[134]

The Plaintiffs argue that the provisions cited by the

Defendants are standard integration clauses,[135] not explicit anti-

---

[132]   <u>Universal Am. Corp.</u>, 176 F. Supp. 3d at 400.

[133]   Although the Defendants assert this argument with respect to all the agreements, the Court need consider it only with respect to the Investment Agreement and the APA.  <u>See</u> Adv. D.I. 1 Ex. B, at § 10.10 ("Entire Understanding.  This [APA] and the Related Agreements set forth the entire agreement and understanding of the Parties with respect to the transactions contemplated hereby and supersede and replace any and all prior agreements, arrangements and understandings, written or oral, between the Parties relating to the subject matter hereof."), Ex. E, at § 8.05 ("This [Investment] Agreement, including the Company Disclosure Letter, together with the other Transaction Documents, constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, among the parties and their Affiliates, or any of them, with respect to the subject matter hereof and thereof.  No provision of this [Investment] Agreement shall confer upon any Person other than the parties hereto and their permitted assigns any rights or remedies hereunder.").

[134]   <u>Universal Am. Corp.</u>, 176 F. Supp. 3d at 403 (dismissing fraud claims to the extent they were based on extra-contractual statements or omissions because a "party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim.'") (citation omitted).

[135]   <u>See</u> <u>supra</u> note 133.

reliance provisions.  The Plaintiffs contend that such clauses
cannot be interpreted to bar actual fraud claims.[136]

The Defendants respond with a case where the court dismissed
claims on the basis of an anti-reliance provision notwithstanding
contractual language preserving fraud claims.[137]  The Defendants
assert that the provision in that case is similar to the one
here.

Lastly, the Defendants argue that the Plaintiffs have failed
to cite any adequate non-conclusory allegation of reliance in
their complaint and contend that Plaintiffs' silence on this
point concedes that there is no such allegation.

The Court agrees with the Plaintiffs that the Complaint does
allege that the Plaintiffs relied on misrepresentations and
actions of the Defendants which support their claims of fraud.[138]
The standard integration clauses in the APA and the Investment

---

[136]   See, e.g., Blattman v. Siebel, C.A. No. 15-530-GMS,
2016 WL 1450946, at *3 (D. Del. Apr. 12, 2016) (denying motion to
dismiss fraud claims based on integration clause).

[137]   See, e.g., ChyronHego Corp. v. Wight, No. 2017-0548,
2018 WL 3642132, at *6 (Del. Ch. July 31, 2018) (finding that the
"Plaintiffs here are free to sue for fraud, but the anti-reliance
language of Section 4.7 dictates . . . [that the Plaintiffs
cannot] bootstrap a dog's breakfast of extra-contractual fraud
claims onto contractual misrepresentations").

[138]   See, e.g., Adv. D.I. 1 at ¶ 84 ("Plaintiffs, seeking a
strategic partner to address their funding needs and to help
develop a scalable vehicle development platform for the next
generation of electric vehicles, justifiably relied on the
statements of Foxconn, one of the world's largest multinational
manufacturing companies.").

Agreement[139] are not sufficient to foreclose the Plaintiffs'
claims of reliance on alleged misrepresentations by the
Defendants.[140]

With respect to those contracts, the Court finds that the
Plaintiffs do allege reliance, specifically that they relied on
the Defendants' representation that they were seeking a
partnership in evaluating whether to sell the manufacturing plant
to them under the APA and enter into the Investment Agreement.
The Court concludes that those allegations are sufficient at the
pleading stage.[141]

---

[139]   See supra note 133.

[140]   Blattman, 2016 WL 1450946, at *3 ("The presence of a
standard integration clause alone, which does not contain
explicit anti-reliance representations and is not accompanied by
other contractual provisions demonstrating with clarity that the
plaintiff had agreed that it was not relying on facts outside the
contract, will not suffice to bar fraud claims.").  In contrast,
the CMA contained an express agreement that the parties were not
relying on any extra-contractual statements in entering into the
agreement.  See Adv. D.I. 1 Ex. C, at 26 ("Each Party
acknowledges and agrees that no agreements, representations,
warranties, or collateral promises or inducements have been made
by any Party to this Agreement except as expressly set forth
herein or in the Schedules and any addenda attached hereto or
referenced herein, and that it has not relied upon any other
agreement or document, or any verbal statement or act in
executing this Agreement.") (emphasis added).

[141]   See Miller v. Greenwich Cap. Fin. Prod., Inc. (In re
Am. Bus. Fin. Servs., Inc.), 384 B.R. 80, 90 (Bankr. D. Del.
2008) (denying motion to dismiss common law fraud claim and
holding that question of justifiable reliance was properly
reserved for trial). See also Franklin Cty. Area Dev. Corp. v.
Leos (In re Leos), 462 B.R. 151, 155 (Bankr. M.D. Pa. 2011)
(denying motions for summary judgment on issue of justifiable
reliance because justifiability is evaluated under a subjective

For the above reasons, the Court concludes that the Plaintiffs have sufficiently pled the elements of fraud with particularity.  The Motion to Dismiss will, therefore, be denied as to the Plaintiffs' fraud claims in Counts One and Eight.

### 3.   Tortious Interference with Contract

In Count Ten, the Plaintiffs bring a claim against Hon Hai for tortious interference with contractual relations.  The elements of tortious interference under Delaware law are "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury."[142]

The Defendants argue that the Plaintiffs have failed to state a claim against Hon Hai because it is related to the parties to the contracts at issue.  Under Delaware caselaw, the Defendants contend that the alleged tortfeasor must "be a stranger to both the contract and the business relationship giving rise to and underpinning the contract."[143]  This is because a party to a contract or to the business relationship cannot

---

standard and issues of fact remained).

[142]   AM Gen. Holdings LLC on behalf of Ilshar Cap. LLC v. Renco Grp., Inc., No. 7639-VCN, 2013 WL 5863010, at *12 (Del. Ch. Oct. 31, 2013).

[143]   Tenneco Auto., Inc. v. El Paso Corp., No. Civ. A. 18810-NC, 2007 WL 92621, at *5 (Del. Ch. Jan. 8, 2007).

interfere with its own contract or relationship.[144]  According to
the Defendants, that rule also precludes an affiliate from being
sued for tortious interference with contract where it is "under
the control of a contracting party [and] used by that party as an
instrument to breach the contract."[145]  In this case, the
Defendants assert that Hon Hai is an affiliate of all of the
other Defendants and, therefore, cannot be sued for interfering
with its affiliates' contracts.

The Plaintiffs contend, and the Defendants acknowledge, that
there is an exception to the affiliate rule, if it can be
established that the affiliate was "motivated by some malicious
or other bad faith purpose."[146] Under this standard, a plaintiff
must allege that "the interfering party was not pursuing in good
faith the legitimate profit seeking activities of the affiliated
enterprises."[147]

The Plaintiffs assert that they have met the Delaware
affiliate exception because they do allege specific bad faith by
Hon Hai.[148]

---

[144]    Id.

[145]    AM Gen. Holdings, 2013 WL 5863010, at *12 (internal
quotations and citation omitted).

[146]    Id.

[147]    Id.

[148]    Adv. D.I. 1 at ¶ 42 ("Defendants' actions were driven
by [Hon Hai], which was determined to maliciously and in bad

The Defendants contend that the Plaintiffs cannot meet the affiliate exception by simply relying on "talismanic" conclusions which are insufficient to satisfy the pleading requirements for bad faith.

The Court concludes that the Plaintiffs have adequately alleged bad faith under the affiliate exception standard.  The Defendants again focus too much on individual paragraphs within the Complaint rather than the Complaint as a whole.  The Court finds that the Complaint's allegations of fraud, discussed in detail above, are sufficient to infer that Hon Hai was not pursuing in good faith the legitimate profit-seeking activities of the enterprise but was engaged in a fraudulent scheme to obtain the Plaintiffs' assets.

Therefore, the Court will deny the Motion to Dismiss the tortious interference claim in Count Ten.

### 4.   Equitable Subordination

Finally, in Count Eleven the Plaintiffs bring a claim against the Defendants for equitable subordination of any claim that has been or will be filed by the Defendants and any equity

---

faith destroy Plaintiffs' business in an effort to strip Plaintiffs' assets and poach its talent at little cost"), ¶  7 ("Instead of building a thriving business for the benefit of all Lordstown's stakeholders, [Hon Hai] maliciously and in bad faith destroyed that business, costing Lordstown's creditors and shareholders billions.").

interests in the Debtors held by the Defendants.[149]

"[T]hree conditions must be satisfied before exercise of the power of equitable subordination is appropriate: (1) [t]he claimant must have engaged in some type of inequitable conduct; (2) [t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) [e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code]."[150]

a.  <u>Proper Standard</u>

Where the defendant is an insider, the plaintiff has a lower burden to prove "inequitable conduct . . . because a claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized."[151]  In that case, the plaintiff need establish only <u>unfair conduct which includes</u> "where the insider or fiduciary: (i) dominated and exploited the debtor; (ii) violated the 'rules of fair play and good conscience;' (iii) engaged in illegal or fraudulent conduct; (iv) breached fiduciary duties owed to the debtor, stockholders, or creditors; (v) used

---

[149]    Adv. D.I. 1 at ¶ 162.

[150]    <u>In re Winstar Commc'ns, Inc.</u>, 554 F.3d 382, 411 (3d Cir. 2009) (internal quotes and citations omitted).

[151]    <u>Tilton v. MBIA Inc. (In re Zohar III, Corp.)</u>, 639 B.R. 73, 91 (Bankr. D. Del. 2022), <u>aff'd</u>, 620 F. Supp. 3d 147 (D. Del. 2022), <u>appeal dismissed sub nom. In re Zohar III, Corp</u> (3d Cir. Nov. 10, 2022) (citation omitted).  <u>See also Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)</u>, 473 B.R. 525, 582 (Bankr. D. Del. 2012).

-51-

'the debtor as a mere instrumentality or alter ego;' (vi) breached a contract; or (vii) if a controlling stockholder, undercapitalized the debtor or capitalized the debtor with debt."[152]

The Defendants argue that, because they are not insiders of the Debtors, the higher standard for non-insiders applies here. That standard requires that, if the creditor is not an insider, the alleged conduct must amount to "more egregious conduct such as fraud, spoliation, or overreaching."[153]

The Plaintiffs do not dispute that the non-insider standard applies in this case.

### b.   Egregious Conduct

#### i.   Breach of Contract

The Defendants contend that the Complaint fails to allege egregious conduct of the kind necessary to meet the higher non-insider standard because a mere breach of a contract cannot support a claim for equitable subordination.[154]

---

[152]   Tilton, 639 B.R. at 91 (citation omitted).

[153]   Id.

[154]   See, e.g., In re Zohar III, Corp., 620 F. Supp. 3d 147, 153 (D. Del. 2022) (holding that bank's actions in refusing extension of credit and allowing debtor to default was not egregious conduct supporting equitable subordination because "[t]here is nothing inequitable, however, about using contractual rights to a strategic advantage, nor does such a strategy support the inference that MBIA was deliberately misleading Plaintiffs for years about its willingness to negotiate a maturity extension").

The Plaintiffs respond that a breach of contract may support an equitable subordination claim.[155]  They argue that the Zohar case cited by the Defendants is distinguishable because the alleged inequitable conduct there was the pursuit of the defendant's contractual rights.[156]  The Plaintiffs contend that, in contrast, in this case the Complaint alleges numerous breaches of contract by the Defendants, not the mere pursuit of their contractual rights.

The Defendants respond that the Plaintiffs rely on a New York case and have failed to cite any Third Circuit authority that allows equitable subordination for a breach of contract.

The Court agrees with the Plaintiffs that, in certain circumstances, a breach of contract may be sufficiently egregious conduct to meet the standard for equitable subordination of a non-insider's claim.[157]  While not specifically holding that a breach of contract could support equitable subordination, the Third Circuit has held that hardnosed tactics, even if they were pursuant to the defendant's contractual rights, were sufficiently

---

[155]   See, e.g., LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.), 511 B.R. 253, 348 (Bankr. S.D.N.Y. 2014) (concluding that equitable subordination may be based on "a substantial breach of contract and advantage-taking by the creditor" and finding that breaches of contract in bad faith constituted inequitable conduct).

[156]   Zohar III, 620 F. Supp. 3d at 153.

[157]   See, e.g., LightSquared, 511 B.R. at 348.

egregious to support equitable subordination.[158]  Therefore, the
Court is not prepared to hold that a breach of contract in bad
faith would not suffice as egregious conduct by a non-insider to
support an equitable subordination claim.  The Court finds that
the Plaintiffs have alleged numerous and continuing breaches of
contract by the Defendants that, if proven, could constitute
egregious conduct sufficient to support their equitable
subordination claim.[159]  Based on the facts alleged by the
Plaintiffs, the Defendants were not merely pursuing their
contractual rights, as did the bank in the _Zohar_ case.[160]

---

[158]  _Winstar_, 554 F.3d at 413 (affirming bankruptcy court's
findings of egregious conduct where "[a]lthough Lucent had the
right to issue the refinancing notice 'at its sole discretion'
after a triggering event, Lucent essentially delayed the
refinancing notice to prevent public disclosure of Winstar's poor
financial health and thereby induce other creditors to provide
funds to Winstar.") (internal citations omitted).

[159]  _See_ Adv. D.I. 1 at ¶ 160 ("As detailed above, the
Defendants have engaged and continue to engage in grossly
inequitable conduct, and have effectively destroyed the Debtors'
business, by, among other things, refusing to honor the
contractual promises that they made in order to secure the
Lordstown plant, failing to invest approximately $170 million of
additional equity capital in Lordstown's business, and refusing
to work with the Debtors to develop the next generation of
electric trucks."), ¶ 57 ("But Defendant has refused to use
commercially reasonable efforts to reach agreement on the
Preferred Funding Milestones and the EV Project Budget [as
required under Section 5.20 of the Investment Agreement]; indeed,
it has refused to engage at all."), ¶¶ 61-63 (Hon Hai improperly
sent notice of default based on Nasdaq notice, precipitating
further drop in stock price and withdrawal of potential
customers).

[160]  _Zohar III_, 620 F. Supp. 3d at 153.

ii.  <u>Fraud</u>

In addition, the Plaintiffs contend that they have alleged actual fraud on the part of the Defendants.  They argue that there is no question that under the higher standard applicable to non-insiders, fraud is sufficiently egregious conduct to warrant equitable subordination of the Defendants' claims.[161]

In response, the Defendants assert that, as they contend above, the Plaintiffs have failed to allege fraud sufficiently, so the equitable subordination claim should be dismissed.[162]

The Court has already determined that the Plaintiffs have stated a plausible claim for fraud.  Those allegations are sufficiently "egregious" conduct to support a claim for equitable subordination.[163]  Therefore, the Court concludes that the Plaintiffs have alleged sufficiently egregious conduct to support equitable subordination of the Defendants' claims.

---

[161]  <u>Century Grove, Inc. v. Iselin (In re Century Grove, Inc.)</u>, 151 B.R. 327, 335 (Bankr. D. Del. 1993) (finding that allegations of a fraudulent scheme involving Century's CEO and its creditor was sufficient to state a claim for equitable subordination).

[162]  <u>Desmond v. ASR Acquisition Corp. (In re Desmond)</u>, 334 B.R. 78, 86 (Bankr. D.N.H. 2005) (dismissing equitable subordination claim because "the complaint is patently devoid of any material facts to support a claim for fraud.  Merely alleging that ASR's conduct was fraudulent without the necessary factual allegations is not enough to survive a motion to dismiss.").

[163]  <u>Winstar</u>, 554 F.3d at 412.

-55-

c.   <u>Harm</u>

The Defendants finally argue that the Plaintiffs have failed to allege the requisite harm element, because they do not show how the Defendants' conduct actually harmed the Plaintiffs or their creditors.[164]   They assert that the Plaintiffs' allegation of harm is limited to a conclusory recitation of the law.[165]

The Plaintiffs respond that they have alleged harm, pointing to numerous paragraphs of the Complaint.

The Court finds that the Plaintiffs have clearly alleged harm based on their central allegation that the Defendants persuaded them to transfer their assets for less than fair value and drove them out of business.   The Defendants focus on only one paragraph of the Complaint but ignore the many paragraphs which

---

[164]   <u>Zohar III</u>, 639 B.R. at 93 ("Because equitable subordination is remedial, a claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct.").   <u>See also</u> <u>Youngman v. Yucaipa Am.</u> <u>Alliance Fund I, L.P. (In re ASHINC Corp.)</u>, 640 B.R. 1, 56-58 (Bankr. D. Del. 2022) (having granted equitable subordination at the summary judgment stage and reserving the amount that should be subordinated for trial, the court ultimately concluded that defendants' claims should not be equitably subordinated in any amount because the  plaintiff failed to establish that defendant caused any harm to the debtor or other creditors, other than breach of contract and avoidable transfers for which the plaintiff had already obtained judgments).

[165]   <u>See</u> Adv. D.I. 1 at ¶ 161 ("The actions of Defendants complained of herein constitute inequitable misconduct that harmed the Debtors, their estates, and the Debtors' other creditors, and has conferred an unfair advantage on Defendants.").

allege harm.[166]  The Plaintiffs' allegations are sufficient to
assert harm to themselves and their creditors.[167]

>    d.    <u>Extent of Subordination</u>

Finally, the Defendants contend that the Plaintiffs seek to
equitably subordinate both their claims and their equity
interests below all other creditors and equity holders.  They
argue that this is not permissible.[168]  The Defendants

---

[166]    <u>Id.</u> at ¶ 85 ("As a direct and proximate cause of
Foxconn's fraudulent conduct, the Company sold its most valuable
asset and refrained from pursuing opportunities with other
strategic partners.  Deprived of necessary funding and
cooperation to develop a scalable vehicle development platform,
Plaintiffs' ability to continue operations is in jeopardy, and
they have suffered, and will continue to suffer, billions of
dollars in damages."), ¶ 160 ("As detailed above, the Defendants
have engaged and continue to engage in grossly inequitable
conduct, and have effectively destroyed the Debtors' business,
by, among other things, refusing to honor the contractual
promises that they made in order to secure the Lordstown
plant, failing to invest approximately $170 million of additional
equity capital in Lordstown's business, and refusing to work with
the Debtors to develop the next generation of electric trucks."),
¶ 61-63 (Hon Hai improperly sent notice of default based on
Nasdaq notice, precipitating further drop in stock price and
withdrawal of potential customers), ¶ 78 ("The Company has
recently laid off a substantial number of its employees, and its
ability to continue its operations is now in question.
Meanwhile, Foxconn is hiring Lordstown employees and continues to
refuse to provide financing and cooperation that is essential for
Lordstown to sustain its ongoing operations.").

[167]    <u>Instar</u>, 554 F.3d at 389-93, 414 (finding sufficient
harm to debtor and its creditors from conduct forcing the debtor
to purchase unneeded equipment and to incur additional debt which
ultimately caused the debtor to file bankruptcy).

[168]    <u>Zohar</u>, 639 B.R. at 93 ("Because equitable subordination
is remedial, a claim or claims should be subordinated only to the
extent necessary to offset the harm which the bankrupt and its
creditors suffered on account of the inequitable conduct.").

specifically argue that section 510(c) of the Bankruptcy Code does not allow a creditor's claim to be equitably subordinated to equity interests.[169]

The Plaintiffs do not respond to this argument.

The Court agrees with the Defendants that section 510(c) permits the equitable subordination of claims or interests only to other claims or interests of the same priority. The Court, however, does not find any indication in the Complaint that the Plaintiffs are attempting to subordinate any of the Defendants' claims below equity interests, in contravention of the ordinary rules of priority.[170] Furthermore, the extent to which the Defendants' claims may be subordinated to other claims or their equity interests may be subordinated to other equity interests depends on the evidence which the Plaintiffs present at trial.

For the foregoing reasons, the Court concludes that the Plaintiffs have stated a claim for equitable subordination. Accordingly, the Motion to Dismiss the equitable subordination claim in Count Eleven will be denied.

---

[169] _Instar_, 554 F.3d at 414 (holding that equitable subordination of creditor's claims to equity interests were contrary to section 510(c)).

[170] Adv. D.I. 1 at ¶ 163 ("As a result of Defendants' inequitable conduct, any and all proofs of claims filed by the Defendants and any equity interests in the Debtors held by Defendants should be equitably subordinated pursuant to 11 U.S.C. § 510(c).").

IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Court will grant the Motion to Dismiss in part and deny it in part.  The Court will dismiss Counts Six and Nine because they are subject to valid arbitration provisions but will deny the Defendants' request to stay this adversary proceeding pending arbitration of those claims.  Finally, the Court will deny the Motion to Dismiss with respect to all other Counts of the Complaint.

An appropriate Order is attached.


Dated: October 1, 2024              BY THE COURT:


                                    Mary F. Walrath
                                    United States Bankruptcy Judge